# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
WALTER W. LANCASTER,                    )
                                        )
             Plaintiff,                 )
                                        )
      v.                                )      Civil Action No. 10-0940 (ABJ)
                                        )
DAVITA VANCE-COOKS,                     )
Acting Public Printer, U.S. Government  )
Printing Office,                        )
                                        )
             Defendant.                 )
_____)

## MEMORANDUM OPINION

Plaintiff Walter Lancaster sues his employer, the United States Government Printing Office ("GPO"), under the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended ("Title VII"). Compl. [Dkt. #1]. Lancaster, who worked as a forklift power truck operator for the GPO, claims that the GPO subjected him to: retaliation for seeking to enforce his rights under Title VII, a hostile work environment, and discrimination. Compl. ¶¶ 1, 56–65. His complaint describes a number of incidents that he alleges occurred over a three year period. Before the Court is defendant's motion to dismiss the complaint or for summary judgment, Def.'s Mot. to Dismiss or for Summ. J. ("Def.'s Mot.") and Mem. in Supp. of Def.'s Mot. ("Def.'s Mem.") [Dkt. # 30], which Lancaster opposes, Pl.'s Opp. to Def.'s Mot. to Dismiss or for Summ. J. [Dkt. # 34] ("Pl.'s Opp."). Upon consideration of the record of this case, the Court will grant defendant's motion. The work place grievances recounted in the complaint do not add up to a hostile work environment, and plaintiff has been unable to show that any adverse employment actions he experienced were prompted by discrimination or retaliation.

1

## PROCEDURAL HISTORY

Lancaster asserts in his complaint that, as a result of an Equal Employment Opportunity ("EEO") claim he settled with the GPO in November 2006, he was:

- denied the opportunity to work overtime from January 2007 to June 2007, Compl. ¶¶ 24–25;

- written up for failing to report to work on Saturday, June 23, 2007, *id.* ¶ 33;

- given a disciplinary memo for leaving his post without approval, which was later rescinded, *id.* ¶¶ 38–40, 42;

- denied eight hours of administrative leave, *id.* ¶¶ 45–46;

- denied a lunch break in October 2007, *id.* ¶ 47a;

- forced to do the work of three power truck operators, *id.* ¶ 47b;

- falsely accused of threatening his immediate supervisor, resulting in his suspension from work for thirty days, *id.* ¶ 47d;

- cursed at or flashed obscene gestures by some of his supervisors, *id.* ¶ 47e;

- subjected to a hostile sexual environment by his immediate supervisor, who "discussed her sexual preferences and activities openly in front of [him] and other employees" and had "a habit of putting her hands on their behinds," *id.* ¶ 48; and

- consistently forced to work "out of his job description" and assigned the position of "Extra" or "Floater," even though no such position existed under the union contract, *id.* ¶¶ 51–53.

According to his complaint, these acts by the GPO amounted to retaliation, a hostile work environment, and discrimination on the basis of race, religion, sex, national origin, and color in violation of Title VII. *Id.* ¶¶ 1, 56–65.

The GPO moves to dismiss the complaint for failure to state a claim, and alternatively, for summary judgment. Def.'s Mot. In doing so, it provides a Statement of Material Facts Not

in Dispute, which contains twenty-seven paragraphs of facts that it claims are material and not disputed. Def.'s Statement of Material Facts Not in Dispute [Dkt. # 30-25] ("Def.'s SOF"). Plaintiff's opposition to the motion includes a Statement of Contested Facts, which admits all paragraphs in defendant's statement except two. *See* Pl.'s Opp.; Pl.'s Statement of Contested Facts [Dkt. # 34-2] ("Pl.'s SOF").

## FACTUAL BACKGROUND

Walter Lancaster is an African-American male who began working for the GPO in 1990. Compl. ¶¶ 4, 7; Pl.'s Opp. at 1; Pl.'s SOF ¶ 3; Def.'s SOF ¶ 3. He was promoted to forklift operator around 1995. Lancaster Dep., Ex. 1 to Def.'s Mot. [Dkt. # 30-1] ("Lancaster Dep.") at 22:16-22. In 2001, he filed an EEO claim against the GPO, which settled in November 2006. Pl.'s SOF ¶ 4; Def.'s SOF ¶ 4.

Between 2001 and 2008, Lancaster worked for three sections of the GPO. From 2001, Lancaster worked in the Delivery Division, where Terrence Dudley was his supervisor. Pl.'s SOF ¶¶ 4–5; Def.'s SOF ¶¶ 4–5. Lancaster filed at least one EEO claim during that time. Pl.'s SOF ¶ 4; Def.'s SOF ¶ 4. In about 2003, the supervisor in the Delivery Division "changed from Dudley to Paul Kirby[,] for whom [Lancaster] worked until February 2006." Pl.'s SOF ¶ 6; Def.'s SOF ¶ 6. During that time, Lancaster had no employment related problems. *Id.* In February 2006, Lancaster was reassigned to work in the Bindery Division, where Group Chief Michelle Ballard was his direct supervisor. Pl.'s SOF ¶¶ 7–8; Def.'s SOF ¶¶ 7–8. Gregory Brinkley, Ibrahim Sussan, Robert Alleghar, and John Crawford were also division supervisors in his chain of command. Pl.'s SOF ¶ 8; Def.'s SOF ¶ 8. In November 2006, nine months after Lancaster was transferred to the Bindery Division, his EEO claim arising out of his prior assignment settled. Pl.'s SOF ¶ 4; Def.'s SOF ¶ 4. In November 2007, Lancaster was reassigned

to the Stitching and Pamphlet Section, where his direct supervisor was Rick Orencia. Def.'s SOF ¶ 21; Pl.'s SOF ¶ 21.

## I.      Complaints While at the Bindery Division

Lancaster claims the problems at issue in this lawsuit began shortly after he settled his EEO claim in November 2006. He contends that he was denied overtime hours from January to June 2007 on an equal basis with other employees. Compl. ¶¶ 24–25; Pl.'s Opp. at 2. In support of his claim, he submits pay records for forklift operators. Regular and Overtime Hours, Ex. L to Pl.'s Opp. [Dkt. # 34-15] ("Overtime Hours Chart"); Graph based on Overtime Hours, Ex. M to Pl.'s Opp. [Dkt. # 34-16] ("Overtime Hours Graph"). They show that, from January through June 2007, Ted Dowd received $3,083.85 in overtime pay, Lancaster received $1,367.10, Cameron Matthews receive $229.95, and Oswald White received $10.50. Overtime Hours Chart at 5, 8, 14, 17; *see also* Overtime Hours Graph. The record also reflects "that Lancaster was offered overtime during weekdays, but routinely refused the offered overtime for personal reasons." Pl.'s SOF ¶ 14; Def.'s SOF ¶ 14. Under the union contract that applies to Lancaster, being "offered" overtime and having "worked" overtime are the same for the purpose of calculating which employees are next entitled to overtime. Pl.'s SOF ¶ 15; Def.'s SOF ¶ 15.

On July 11, 2007, Lancaster sought EEO counseling because Greg Brinkley, Assistant Foreperson in the Bindery Division, gave him two verbal warnings: one for failing to work scheduled overtime and the second for leaving the worksite without permission. Pl.'s SOF ¶¶ 8–9; Def.'s SOF ¶¶ 8–9; EEO Counseling Report, Ex. C to Pl.'s Opp. [Dkt. # 34-6] ("EEO Counseling Report"). In his EEO complaint, Lancaster stated that, on Friday, June 22, 2007, Brinkley asked him and other co-workers if they could work overtime the next day. Letter to EEO Counselor, Ex. J to Pl.'s Mot. [Dkt. # 34-13] ("EEO Letter") at 1; Compl. of Discrimination

# 07-25, Ex. 7 to Def.'s Mot. [Dkt. # 30-7] ("Discrim. Compl.") at 2. According to Lancaster, Brinkley told Lancaster that he would check to see if he would need a truck driver that day but never got back to him. EEO Letter at 1; Discrim. Compl. at 2. The next Monday, June 25, 2007, Lancaster spoke with his union shop steward about overtime, and she told him that she thought he was being treated unfairly with respect to overtime. *Id.* That day, Lancaster also sent a letter to Bindery Division Superintendent John Crawford about not receiving overtime. EEO Letter at 1; Discrim. Compl. at 2, 12. Two days later, according to Lancaster, Brinkley asked him why he did not come to work on Saturday, June 23, 2007. EEO Letter at 2; Discrim. Compl. at 3. Lancaster told Brinkley that Brinkley never specifically told him to come in, and Brinkley responded that he was going to "carry [him] absent for not showing up." EEO Letter at 2; Discrim. Compl. at 3. Lancaster then tried to obtain overtime records from Brinkley, and he claims his inability to do so was because a "major cover up was taking place." EEO Letter at 2–3; Discrim. Compl. at 3–4. Defendant states, and Lancaster agrees, that the alleged denial of overtime on June 23, 2007 was a "singular incident, involving one Saturday in 2007." Pl.'s SOF ¶ 10; Def.'s SOF ¶ 10.

The second verbal warning Lancaster received was for leaving the worksite without permission on Saturday, July 7, 2007. Pl.'s SOF ¶ 9; Def.'s SOF ¶ 9. On that day, Lancaster was working overtime on his forklift truck when he was asked to perform tasks referred to as "skid work." EEO Letter at 1; Discrim. Compl. at 2. Lancaster maintains that this work is of "a lower classification" than forklift work and that GPO union employees are permitted to decline any overtime assignment that is in a lower graded position. Compl. ¶ 38.[1] Rather than do the requested skid work for half an hour, Lancaster refused and went home. Pl.'s SOF ¶ 11; Def.'s

---

1    When employees are "asked to work in below-grade assignments during overtime hours, [they] are paid at their regular salary rate." Def.'s SOF ¶ 15; *accord* Pl.'s SOF ¶ 15.

SOF ¶ 11. Brinkley gave him a verbal warning for leaving work without permission but rescinded the warning four days later, on July 11, 2007. *Id.* On July 11, 2007, Lancaster sought EEO counseling related to his overtime complaints, and on September 1, 2007, he filed a formal EEO complaint. Compl. ¶¶43–44.

Around this time, Lancaster complains that Bindery Division Superintendent John Crawford denied him eight hours of administrative leave to work on his EEO complaint regarding overtime. Compl. ¶ 45; Pl.'s SOF ¶ 13; Def.'s SOF ¶ 13. Instead, Crawford gave him two hours of leave on the advice of the EEO Office. Pl.'s SOF ¶ 13; Def.'s SOF ¶ 13. On October 4, 2007, Lancaster filed a formal EEO complaint on the administrative leave issue, Compl. ¶ 46, but he received a letter dated November 8, 2007, from the GPO Chief of Counseling and Complaints Processing, advising him that a denial of administrative leave does not state a claim for relief under EEOC regulations and guidance. *See* Nov. 8, 2007 Letter, Ex. 3 to Def.'s Mot. [Dkt. # 30-3] ("Nov. 8 Letter") at 4.

A few months later, on October 30, 2007, Lancaster and all the other Bindery employees worked through their lunch break. Pl.'s SOF ¶ 16; Def.'s SOF ¶ 16. The next day, on October 31, 2007, Lancaster received excellent performance ratings for 2006 through September 30, 2007. Pl.'s SOF ¶ 17; Def.'s SOF ¶ 17. On the same day, an incident occurred between Lancaster and his first line supervisor, Michelle Ballard. Pl.'s SOF ¶¶ 18–19; Def.'s SOF ¶¶ 18–19.

## II.     The October 31, 2007 Incident

According to defendant, on October 31, 2007, a dispute arose over whether a co-worker of Lancaster's, who was on his lunch break during a training assignment, should be required to work with Lancaster. Def.'s SOF ¶¶ 18–19. Lancaster was "visibly upset, threatening in his

demeanor and insubordinate toward Ballard." *Id. ¶* 18. The GPO Police were called to the worksite that day and investigated the incident. *Id.* ¶ 19. Several eyewitnesses provided statements to the GPO Police, and there is evidence on the record that indicates Lancaster was pointing his finger in Ballard's face and threatening her. *See, e.g.*, GPO Police Report, Ex. D to Pl.'s Opp. [Dkt. # 34-7] ("GPO Police Report") at 5.[2] At a minimum, defendant asserts, Lancaster was "raising his voice at his supervisor, Michelle Ballard." Def.'s SOF ¶ 19.

Plaintiff disputes the GPO's characterization of the incident, stating that he did have a discussion with Ballard that day but that he was not threatening. Pl.'s SOF ¶ 18. On the day of the incident, Lancaster stated:

> I never threatened her. I asked her why she was not requiring Mr. Mathews to help me. She raised her voice and I raised my voice at her. I in no way said anything to Ms. Ballard that could be considered threatening. I spoke to her about the job and I asked why she was having me work by myself.

GPO Police Report at 2. Plaintiff also contends that there is conflicting evidence on whether he was pointing in Ballard's face or whether he threw simply his hand up, and whether he was five feet away from Ballard or inches away from her. Pl.'s SOF ¶ 18, citing Applewhite Dep., Ex. A to Pl.'s Opp. [Dkt. # 34-4] ("Applewhite Dep.") at 19:9–12, 9:11–10:16; Ballard Dep., Ex. B to Pl.'s Opp. [Dkt. # 34-5] ("Ballard Dep.") at 37:6–38:5. Lancaster also notes that Ballard testified she "may have" asked Lancaster to come into her office, suggesting she did not feel threatened, and that Ballard testified that he did not say anything threatening. *Id.*, citing Ballard Dep. at 39:8–9, 42:13–16.

After an investigation of the October 31 incident, Bindery Division Foreperson Ibrahim Sussan proposed that Crawford suspend Lancaster for thirty days. Pl.'s SOF ¶ 20; Def.'s SOF ¶

---

2    Defendant also attached a copy of this report to its motion. *See* GPO Police Report, Ex. 5 to Def.'s Mot [Dkt. # 30-5].

20.  Crawford considered the circumstances of the incident and Lancaster's prior record and service and on February 28, 2008, imposed a thirty day "paper" suspension, which consisted of Lancaster working sixteen days with pay and fourteen days without pay.  Crawford Dep., Ex. 11A to Def.'s Mot. [Dkt.# 30-16] ("Crawford Dep.") at 23:20–24:12 (describing the suspension as "[s]ixteen paper, 14 actually on the street. . . . [I]t's a 30-day suspension on the record"); *see also* Pl.'s SOF ¶ 20; Def.'s SOF ¶ 20.

### III.  Complaints While at the Stitching and Pamphlet Section

In early November 2007, shortly after the October 31, 2007 incident, Lancaster was transferred to the Stitching and Pamphlet Section under Rick Orencia's supervision.  Pl.'s SOF ¶ 21; Def.'s SOF ¶ 21.  Lancaster was "very comfortable" after his transfer but complains about other incidents involving other division-level supervisors.  Pl.'s SOF ¶¶ 21, 24; Def.'s SOF ¶¶ 21, 24.

During the week of April 21, 2008, Orencia told Lancaster that the second line supervisor, Sussan, asked Orencia to assign Lancaster overtime, which he did.  Pl.'s SOF ¶ 22; Def.'s SOF ¶ 22.  "On June 28, 2008, while working overtime, Lancaster was replaced by another truck driver, Robinson, who worked in Greg Brinkley's unit during the regular work week."  Def.'s SOF ¶ 23; *accord* Pl.'s SOF ¶ 23.  Lancaster contends that Brinkley had him switch tasks with Robinson to harass him.  Lancaster EEO Aff., Ex. 7B to Def.'s Mot. [Dkt. # 30-9] ("Lancaster EEO Aff.") at 16.  A couple of weeks later, on July 11, 2008, Lancaster complained of two incidents:  first, that he spoke with Brinkley whom he says attempted to coerce him into a confrontation, and second, that he should have been offered eight hours of overtime and that Sussan was not following the union contract.  Lancaster EEO Aff. at 19–20; Pl.'s SOF ¶ 24; Def.'s SOF ¶ 24.  Lancaster contends the overtime hours went to James Ray and

that Sussan was violating the union contract with respect to distributing overtime. Lancaster EEO Aff. at 19. He further complains that Ray was given overtime work the following day, July 12, 2008. Lancaster EEO Aff. at 20; Pl.'s SOF ¶ 25; Def.'s SOF ¶ 25. A week later, "[o]n July 18, 2008, Lancaster and Brinkley exchanged words." Def.'s SOF ¶ 26; *accord* Lancaster EEO Aff. at 21; Pl.'s SOF ¶ 26. And August 22, 2008, night supervisor Karen Evans asked Lancaster to work below his grade at Sussan's request, which plaintiff agrees was a "singular event." Def.'s SOF ¶ 27; *accord* Pl.'s SOF ¶ 27.

## STANDARD OF REVIEW

### I.    Motion to Dismiss

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action,'" *id*.,

quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.*

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily "consider only the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

## II.     Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

The complaint asserts three causes of action: retaliation, hostile work environment, and discrimination. Compl. ¶¶ 56–65. Defendant moves for dismissal or, alternatively, for summary judgment, on the grounds that most of the acts Lancaster describes do not constitute actionable adverse employment actions within the meaning of Title VII, and that the only act that does – the thirty day suspension – was based on a legitimate non-discriminatory, non-retaliatory reason, which was not a pretext for discrimination or retaliation. *See generally* Def.'s Mot. and Def.'s Mem. In opposing the GPO's motion, Lancaster submitted evidence and argument in support of his claim for retaliation based on the alleged denial of overtime from January to June 2007 and on the suspension based on an allegedly false accusation that he threatened his supervisor. But the opposition did not address either the hostile work environment claim or the discrimination claim. *See* Pl.'s Opp. Because plaintiff has failed to come forward with sufficient evidence to make a prima facie case of retaliation with respect to the 2007 overtime claim or the suspension claim, failed to present sufficient evidence for a reasonable jury to conclude that the suspension was a pretext, and failed to present evidence to support a claim for a hostile work environment or discrimination, the Court will grant defendant's motion.

# I. Plaintiff Has Failed to Present Sufficient Evidence to Establish a Claim for Retaliation

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–16(a). It also prohibits employer retaliation when an employee has "opposed any practice made an unlawful employment practice by this subchapter." *Id.* § 2000e–3(a). Allegations of retaliation under Title VII are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under this framework, plaintiff bears the burden of making a prima facie showing by a preponderance of the evidence. *Id.* To sustain a prima facie case of unlawful retaliation, Lancaster must show that the GPO "took materially adverse action against him because he participated in protected activity." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013), citing *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); *accord Jones*, 557 F.3d at 678–80 (holding that plaintiff engaged in statutorily protected activity, suffered a materially adverse action by his employer, and that a causal link connects the two); *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009); *Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006).

If plaintiff makes that showing, the burden shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer makes this showing, then "the burden-shifting framework disappears," and the question before the Court is "whether a reasonable jury could infer . . . retaliation from all the evidence." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). At the summary judgment stage, however, if the employer produces a legitimate non-discriminatory reason for its actions, "the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Jones*, 557 F.3d at 678, quoting *Brady v.*

*Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (internal quotation marks omitted). The question becomes whether the plaintiff "produced evidence sufficient for a reasonable jury to find that the employer's stated reason" for the adverse action "was not the actual reason and that the employer" actually retaliated against the plaintiff for engaging in protected activities. *Brady*, 520 F.3d at 495. In assessing this question, the Court considers "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Jones*, 557 F.3d at 677, quoting *Carter*, 387 F.3d at 878 (internal quotation marks omitted).

### A. Plaintiff Has Not Established a Prima Facie Case for his Retaliation Claim of Denial of Overtime in 2007

Plaintiff contends that he was denied overtime from January to June 2007 on an equal basis with other employees. Compl. ¶¶ 24–25; Pl.'s Opp. at 2. He submits pay records for himself and other employees to support this contention. *See* Overtime Hours Chart at 5, 8, 14, 17 (showing from January through June 2007 that Ted Dowd received $3,083.85 in overtime pay, Lancaster received $1,367.10, Cameron Matthews receive $229.95, and Oswald White received $10.50); *see also* Overtime Hours Graph. But plaintiff's own exhibit reflects that he earned considerably *more* overtime pay than two of the three other employees.[3] Although that fact alone seems to undermine plaintiff's claim, defendant argues that the claim fails because plaintiff has failed to show a causal nexus between the protected activity and the alleged retaliatory action. Def.'s Mem. at 30.

---

3     Defendant also produced overtime records for June 1, 2007 through August 9, 2007, *see* EEO Counseling Report, Ex. 10 to Def.'s Mot. [Dkt. # 30-14] at 3–5, but because the color-coding does not appear in the exhibit, it is unclear how the numbers in defendant's exhibit compare to those in plaintiff's exhibit.

A causal nexus may exist when a protected activity and adverse personal action occur within a time from which a retaliatory motive can be inferred. *Jones*, 557 F.3d at 679. The GPO argues that the time between Lancaster's EEO claim in 2001 and plaintiff's first complaint about overtime in June 2007 is too attenuated to support a causal connection. Def.'s Mem. at 22, 30, citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that a three- or four-month period is insufficient to show causal connection); *Baker v. Potter*, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) (three months may create too wide a temporal chasm to give rise to an inference of a causal connection). *But see Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (holding that no "bright-line three-month rule" exists and measuring temporal proximity from the time between the protected activity and employer's first steps toward an adverse action, not from the time between the protected activity and plaintiff's first formal complaint about the adverse action). Here, less than three months passed from when Lancaster settled his EEO claim on November 6, 2006, and when the alleged retaliatory denial of overtime began in January 2007. Because the claimed denial of overtime, which allegedly began in January 2007, can be viewed as the employer's first steps toward an adverse action, the time between the protected activity and the alleged adverse action is not so great as to foreclose a temporal connection and there may be a dispute of fact on that issue.

But even if the temporal proximity is sufficient to support a reasonable inference of a causal nexus, the Court finds that plaintiff did not suffer a materially adverse action at the hands of his employer. A materially adverse action in a retaliation case means any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), quoting *Rochon*, 438 F.3d at 1219 (internal quotation marks omitted). Plaintiff claims he suffered an

adverse action because he lost overtime pay. Pl.'s Opp. at 12–13. He is correct that the denial of overtime is a materially adverse action because it affects an employee's salary. *See Solis*, 571 F.3d at 1321. But to establish a prima facie case of unlawful retaliation, he must show that it was the employer who was responsible for the materially adverse event. *Bridgeforth*, 721 F.3d at 663. The facts of this case do not support plaintiff's claim.

The evidence shows that it was Lancaster who limited his own availability for overtime for personal reasons. *See* Compl. ¶ 47f (stating plaintiff cannot accept overtime work on Monday through Thursday); Pl.'s SOF ¶ 14 (admitting that Lancaster was offered overtime during weekdays but routinely refused for personal reasons); Def.'s SOF ¶ 14. And Lancaster himself describes an instance on July 7, 2007, when he was afforded overtime hours but chose to leave rather than spend thirty minutes performing "lower classification" skid work, Compl. ¶¶ 38–39 – even though he would have been paid the same amount as if he had performed forklift work, Pl.'s SOF ¶ 15 (admitting that employees who take below-grade assignments during overtime hours are paid at their regular salary rate); Def.'s SOF ¶ 15. This instance, coupled with Lancaster's limited availability, undermines his claim that *the GPO* denied him overtime. [4]

Given these facts, the Court concludes that plaintiff has not shown that he suffered a materially adverse action caused by the GPO and, therefore, has failed to produce evidence to establish a prima facie case of retaliation related to overtime.

---

4    The GPO's contract with the union calculates the distribution of overtime based on overtime offered, not overtime performed. Def.'s Reply to Pl.'s Opp. to Def.'s Mot. to Dismiss or for Summ. J. [Dkt. # 36] ("Def.'s Reply") at 13–14, citing Supplemental Labor-Management Agreement, Ex. 10 to Def.'s Mot. [Dkt. # 30-14] ("Labor Agreement"). It provides that "[w]hen an employee is asked to work overtime and declines, it shall be counted as his/her turn for this overtime." Labor Agreement at 2; *accord* Pl.'s SOF ¶ 15 (admitting that being offered overtime and working overtime are the same for purpose of "calculating the employees next entitled to overtime under the Union plan"); Def.'s SOF ¶ 15.

**B.    Plaintiff Has Not Established a Prima Facie Case for his Retaliation Claim Related to His Suspension and has Not Presented Evidence Sufficient for a Reasonable Jury to Conclude that the Suspension was Pretextual**

Plaintiff also alleges that he suffered retaliation for his protected EEO activity when he was suspended in the wake of the October 31, 2007 dispute with his supervisor, Michelle Ballard.  The GPO agrees that Lancaster satisfies the first and second prong of the *McDonnell Douglas* test – that plaintiff engaged in statutorily protected activity and suffered a materially adverse action by his employer, Def.'s Mem. at 34 – but contends that Lancaster has failed to establish the necessary causal link between the protected activity and the admittedly adverse action, Def.'s Reply at 9–10.   Defendant also argues that the GPO had a legitimate non-retaliatory reason for suspending Lancaster which was not a pretext for retaliation.  Def.'s Mem. at 35; Def.'s Reply at 10–13.

The chronology of the relevant events is as follows:

- November 2006:  settlement of previous EEO action arising out of employment issues between 2001 and 2002, Pl.'s SOF ¶ 4; Def.'s SOF ¶ 4;

- July 2007:  plaintiff seeks EEO counseling concerning overtime issues in his new division, Pl.'s SOF ¶ 9; Def.'s SOF ¶ 9;

- August 6, 2007:  Ballard becomes aware that plaintiff sought EEO counseling, Pl.'s Opp. at 16;

- October 31, 2007:  plaintiff is involved in a dispute with Ballard, Pl.'s SOF ¶¶ 18–19; Def.'s SOF ¶¶ 18–19; and

- February 28, 2008:  thirty day suspension is imposed, Pl.'s SOF ¶ 20; Def.'s SOF ¶ 20.

The parties dispute whether the time that elapsed between Lancaster's protected activity and the adverse personal action is too long to suggest a retaliatory motive.  Lancaster contends that the relevant time period is from August 6, 2007, when Ballard learned that Lancaster was seeking

EEO counseling regarding overtime, to October 31, 2007, when the incident occurred. Pl.'s Opp. at 16–17, citing EEO Counseling Report at 4. According to plaintiff, the eighty-six day time span between these two events is a sufficiently close to infer a retaliatory motive. *Id.* at 17, citing *Breeden*, 532 U.S. at 273.

Defendant does not dispute that the time period should be measured from the protected activity of August 6, 2007, but argues that the adverse action was the suspension handed down on February 28, 2008, not the October altercation itself. Def.'s Reply at 3; *see also id.* at 9, citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (holding that "sporadic verbal altercations or disagreements do not qualify as adverse actions").

As stated above, temporal proximity is measured from the time of the protected activity to the employer's first steps toward an adverse action. *Geithner*, 666 F.3d at 1357–58. Assuming that Ballard intended to retaliate against Lancaster for his EEO activity by lodging a false accusation against him, the false accusation would be the first step toward the suspension. The altercation is not alone the adverse action, but it was the first step toward the adverse action. Accordingly, the Court concludes that there was less than three months from when Ballard learned of Lancaster's protected activity to the first step toward an adverse action, and the time period is not too long to support a claim.

But both parties recognize that temporal proximity alone is not enough to establish retaliation. *See* Pl.'s Opp. at 17 n.2, citing *Solis*, 571 F. 3d at 1322; Def.'s Reply at 9. "[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Solis*, 571 F.3d at 1322, quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). Here, Lancaster does not point to any positive evidence of retaliatory motive.

The GPO states that it suspended Lancaster because of the October 31, 2007 incident, Def.'s Mem. at 21, and thereby meets its burden of production under *McDonnell Douglas*, 411 U.S. at 804. So the question for the Court becomes whether plaintiff has produced sufficient evidence for a reasonable jury to conclude that this stated reason is pretextual, and that the GPO actually imposed the thirty day suspension because Lancaster engaged in protected activities. *Brady*, 520 F.3d at 495.

A plaintiff can demonstrate pretext by showing that his supervisor lied about the underlying facts that formed the predicate for the suspension. *Id.* at 494. Lancaster attempts to do this by arguing that the factual dispute as to whether Lancaster threatened Ballard precludes summary judgment. Pl.'s Opp. at 14; *id.* at 17.[5] But whether Lancaster threatened his supervisor is not the issue. Rather, it is whether he has produced sufficient evidence for a reasonable jury to conclude that the stated reason for suspending Lancaster was a pretext for retaliating against him for engaging in protected activities. Even crediting Lancaster's view of the evidence and assuming a reasonable jury could conclude that his actions did not rise to the level of being threatening, the evidence does ***not*** support a conclusion by a reasonable jury that suspension was a pretext.

There is no dispute that the incident occurred, that Lancaster initiated it, and that he raised his voice at his supervisor because he was unhappy about how she was managing the employees and the workload. Lancaster's own characterization of the incident shows that he

---

5       Lancaster cites witness statements and deposition testimony to support his argument. *See* Pl.'s SOF ¶ 18, citing GPO Police Report at 2 (Lancaster Statement), *id.* at 4 (Ballard statement, stating that he did threaten Ballard), and Applewhite Dep. at 19:9–12 (stating he did not threaten Ballard). He also contends there is a dispute as to whether he was pointing in Ballard's face or whether he just threw his hand up in the air and whether the two were feet or inches apart. Pl.'s SOF ¶ 18, citing Applewhite Dep. at 9:11–10:16, 9:20–21, 10:14 and Ballard Dep. at 37:6–38:5. He also states that Ballard admitted Lancaster never made a verbal threat to her. Pl.'s SOF ¶ 18, citing Ballard Dep. at 39:8–19.

18 at bottom center

started the incident: "Lancaster approached Ballard . . . [to] ask why Matthews was not working and why he was not required to help Lancaster. An exchange followed in which Lancaster raised his voice." Pl.'s Opp. at 3, citing GPO Police Report at 2–3. The GPO Police investigated the incident on the day it occurred, taking statements from Lancaster, Ballard, and four witnesses. *See generally* GPO Police Report. Kathy Green wrote that Lancaster came around the corner on the forklift truck at the same time another forklift driver, Cameron Mathews, was coming off the elevator from class: "Mr. Lancaster went into an irate state hollering and screaming and pointing his finger in his supervisor's face (Michelle Ballard) wondering why Mr. Matthews wasn't on his job . . . ." *Id.* at 8. She wrote that he complained "I shouldn't have to do all this damn work by myself when we have all these truck drivers around here," and that Lancaster was yelling and pointing his finger at Ballard. *Id.* Another co-worker, Sabrina Applewhite, wrote that Lancaster jumped off his forklift truck, went toward Ballard, "threw his hand up in the air" and said "what kind shit [sic] is going on here." *Id.* at 7. Kevin Enterline wrote that Lancaster's "voice was raised and he got in her face and proceded [sic] to argue with her. Ms. Ballard did not raise her voice above an appropriate level even when presented with face to face conflict with Mr. Lancaster." *Id.* at 6. Cameron Matthews wrote that Lancaster was "yelling violently" at Ballard and that his gestures were "threatening and he was pointing his finger in her face, again in a violent and threatening manner." *Id.* at 5.

After the GPO's investigation of the incident, Bindery Division Foreperson Ibrahim Sussan proposed that Lancaster receive a thirty day suspension without pay. Jan. 14, 2008 Suspension Letter, Ex. 6 to Def.'s Mot. [Dkt. # 30-6] at 1. After considering the circumstances and Lancaster's prior record of discipline and service, Superintendent of Binding John Crawford made the punishment less harsh: he issued a thirty day suspension, consisting of fourteen days

without pay and sixteen days of "paper suspension" – meaning that Lancaster actually worked those days and received pay for them. Feb. 28, 2008 Suspension Letter, Ex. 6 to Def.'s Mot. [Dkt. # 30-6] ("Suspension Letter") at 2; Crawford Dep. at 23:20–24:12 (describing the suspension as "[s]ixteen paper, 14 actually on the street. . . . [I]t's a 30-day suspension on the record"). In light of this evidence, including plaintiff's own admissions, the Court finds that the record supports the conclusion that, at a minimum, Lancaster initiated a confrontation with his supervisor, raised his voice, was inappropriate and insubordinate, and caused a workplace disturbance.

The Court further finds that the suspension was imposed as a direct consequence of the workplace disturbance and that plaintiff has pointed to nothing in the record that would create a genuine issue of fact as to whether the thirty day suspension was pretextual. Indeed, the record demonstrates that on the *same day* as the incident, Ballard gave Lancaster an "excellent" performance rating in his annual review. *See* Employee Performance Rating, Ex. 4 to Def.'s Mot. [Dkt. # 30-4] at 1. This undercuts the claim that she was animated by retaliatory motive when she lodged the claim against him. Further, the GPO conducted an investigation, taking statements from Lancaster and Ballard as well as four eyewitnesses on the day of the incident. *See generally* GPO Police Report. Plaintiff has provided the Court with no evidence that any of these eyewitnesses were untruthful in their statements, and the deposition testimony was consistent with the accounts they provided when the events were fresh in their minds.[6] Finally, the record shows that Division Superintendent John Crawford reduced the proposed suspension

---

[6]     Plaintiff emphasizes that Applewhite testified nearly five years later in deposition that Lancaster was not threatening, Applewhite Dep. at 19:10–12, but she also testified that he "just kept on talking and threatening her, you know, while he was on the truck going back and forth," *id.* at 12:18–13:1.

from a full thirty days to thirty days on paper, but only fourteen days without pay. Suspension Letter at 1–2.

Whether Lancaster's behavior can be characterized as "threatening" or not, GPO has presented evidence to support the existence of a legitimate, non-discriminatory and non-retaliatory reason for the short suspension, and plaintiff failed to present sufficient evidence for a reasonable juror to conclude that the proffered reason was pretextual.

## II. Plaintiff Has Failed to Present Sufficient Evidence to Establish a Claim for Discrimination based on a Hostile Work Environment

Although the complaint includes a claim for hostile work environment, Lancaster appears to have abandoned that claim in his opposition brief, because he limited his argument to the retaliation claim. *See generally* Pl.'s Opp. Thus the Court could grant defendant's motion on that claim as conceded, *see* LCvR 7(h); *Celotex Corp.*, 477 U.S. at 323 (holding that a moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of his case for which he has the burden of proof). But upon review of the record, the Court finds that plaintiff has not presented evidence to support a hostile work environment claim in any event.

"Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of [membership in a protected class]." *Walston v. Foley and Lardner, LLP*, 516 Fed. App'x *1, *1 (D.C. Cir. 2013), quoting *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002). Plaintiff presents no evidence that any of the complained-of behavior is related in any way to plaintiff's status as a member of a protected class. For this reason alone, the Court can grant defendant's motion on this claim.

Furthermore, to state a hostile work environment claim under Title VII, plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and

insult" and that this behavior is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted). To determine "whether an actionable hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002), quoting *Harris*, 510 U.S. at 23; *see also Baloch*, 550 F.3d at 1201. This standard "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted).[7] Also, a plaintiff in a hostile work environment claim must provide "evidence of tangible workplace consequences, whether financial, physical, or professional." *Baloch*, 550 F.3d at 1201. Lancaster asserts that a number of events created a hostile work environment, but even taken together, they do not state a claim under Title VII.

Several of Lancaster's grievances did not cause "tangible workplace consequences." *Id.* Lancaster complains that he received a disciplinary memo for refusing to perform duties of a "lower classification." Compl. ¶¶ 38–40. But that disciplinary memo was rescinded. *Id.* ¶ 42. Lancaster also complains about being denied eight hours of administrative leave, *id.* ¶¶ 45–46,

_____

[7] There is some disagreement in this district about whether a hostile work environment claim should be assessed using the modified *McDonnell Douglas* burden-shifting framework or using a totality of the circumstances test. *Compare Bergbauer v. Mabus*, Civ. No. 09–1032 (RCL), 2013 WL 1245944, at *8 n.13 (D.D.C. 2013) (applying totality of the circumstances test), *with Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (applying *McDonnell Douglas*). Lancaster's claim fails under either framework, however, because he has failed to present any evidence to support the notion that the alleged hostile work environment is related to his status as a member of a protected class.

but such complaints are not actionable EEOC claims, *see* Nov. 8 Letter. And being asked to work "out of his job description" and being assigned the position of "Extra" or "Floater" is not the basis for a hostile work environment claim given that employees asked to work in below-grade assignments during overtime hours are paid at their regular salary rate. *See* Pl.'s SOF ¶ 15; Def.'s SOF ¶ 15. As for his complaints about receiving less overtime, as discussed above, Lancaster regularly declined offered overtime for his own personal reasons. Pl.'s SOF ¶ 14; Def.'s SOF ¶ 14.

Plaintiff's other grievances did not alter the conditions of his employment to create an abusive working environment. His complaint about being denied a lunch break *once* in 2007 is of little moment since all Bindery employees on duty that day had to work through their lunch break. Pl.'s SOF ¶ 16; Def.'s SOF ¶ 16. His allegation that he was written up for failing to report to work on Saturday, June 23, 2007, seems to have resulted from a miscommunication, but even assuming it was based on discriminatory animus, plaintiff agrees it was a "singular incident, involving one Saturday in 2007." Def.'s SOF ¶ 10; *accord* Pl.'s SOF ¶ 10. A singular event is not enough to establish a hostile work environment claim, because the "very nature" of a hostile work environment claim "involves repeated conduct." *Morgan*, 536 U.S. at 115.

As for his allegations of incidents of a sexual nature, the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (alterations omitted), quoting *Vinson*, 477 U.S. at 67 (internal quotation marks omitted). In this Circuit, "even multiple instances of physical contact and sexual advances may not be sufficient to meet the demanding legal standard for a hostile work environment. Furthermore, incidents involving only verbal comments, particularly by co-workers, must generally be quite pervasive and severe to be

actionable." *Bergbauer*, 2013 WL 1245944, at *12. Lancaster alleges that some of his supervisors cursed at him and made obscene gestures and that his supervisor, Michelle Ballard, sexually harassed him by discussing her sexual preferences in front of him and other employees and "putting her hands on their behinds." Compl. ¶¶ 47(e), 48.

Fully crediting that Lancaster considered her behavior offensive, the fact that Ballard made comments that were sexual in nature does not mean that they are actionable. Lancaster must establish that any sexual harassment was severe and pervasive. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97–98 (D.D.C. 2007) (five alleged acts of discrimination in two years as well as additional "inappropriate comments" insufficient to constitute hostile work environment). Plaintiff fails to do that here. The incidents cited by Lancaster appear to be isolated. *See Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) ("Isolated incidents do not form a hostile work environment claim."). Further, Ballard's comments were not physically threatening or humiliating.[8] And there is no evidence that they interfered with Lancaster's work performance. *See Bergbauer*, 2013 WL 1245944, at *12.[9] While the Court acknowledges this behavior is inappropriate and can be offensive, it was not "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment," even viewed in the light most favorable to Lancaster. *Harris*, 510 U.S. at 21. And, as pointed out

---

8      One co-worker testified that the "butt slapping" that occurred was not sexual but "playful . . . the equivalent to maybe when you see guys on the basketball court, you know, good shot. . . . Nothing sexual about it." Matthews Dep., Ex. 15 to Def.'s Mot. [Dkt. # 30-24] at 93:4-14.

9      As for plaintiff's claim that he was falsely accused for threatening his supervisor Michelle Ballard on October 31, 2013, he claims she did this in retaliation for his EEO activity, not for discriminatory purposes. *See* Lancaster Dep. at 120:20-25 to 122:1-16 (limiting his suspension claim to retaliation by Ballard).

above, plaintiff has not even tried to substantiate this claim in opposition to the motion for summary judgment.

For these reasons, the Court will grant defendant's motion with respect to the hostile work environment claim.

### III. Plaintiff Has Failed to Present Sufficient Evidence to Establish a Claim for Direct Discrimination

Plaintiff also appears to have abandoned his discrimination claim since he does not bring forward any evidence or argument to support that claim in his opposition to the motion for summary judgment. The Court finds that record does not support a claim for discrimination.

To establish a prima facie case of discrimination, plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006), quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). If he does so, the analysis follows the same *McDonnell Douglas* burden-shifting analysis in a retaliation claim. *McDonnell Douglas*, 411 U.S. at 802; *Brady*, 520 F.3d at 494. Plaintiff bears the ultimate burden of proving that discriminatory animus was the determining cause of the personnel action. *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010), citing *McDonnell Douglas*, 441 U.S. at 803–05.

As stated above, plaintiff has not demonstrated that he suffered a materially adverse action with respect to his 2007 overtime claim or his suspension claim, and he has not presented sufficient evidence for a reasonable jury to find that the GPO's asserted non-discriminatory reason for his suspension was pretextual. As for his other grievances, Lancaster fails to present any evidence that the GPO's actions were the result of any discriminatory animus. For these

reasons, the Court will grant defendant's uncontested motion for summary judgment on the discrimination claim.

## CONCLUSION

For the reasons stated above, the Court will grant defendant's motion for summary judgment. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 26, 2013